IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRADFORD CANNON,** : | | |
| Petitioner : | | |
| : | No. 1:22-cv-01038 | |
| v. : | | |
| : | (Judge Rambo) | |
| **J.L. JAMISON,** : | | |
| Respondent : | | |

## MEMORANDUM

Pending before the Court is <u>pro se</u> Petitioner Bradford Cannon ("Petitioner")'s petition for a writ of habeas corpus filed pursuant to the provisions of 28 U.S.C. § 2241 ("Section 2241"). (Doc. No. 1.) Petitioner challenges his disciplinary proceedings, which resulted in, <u>inter alia</u>, the loss of good-conduct time. (<u>Id.</u>) For the reasons set forth below, the Court will deny Petitioner's Section 2241 petition.

**I.   BACKGROUND**

Petitioner, a prisoner in the custody of the Federal Bureau of Prisons ("BOP"), is currently serving a two-hundred and forty (240) month sentence imposed by the United States District Court for the Southern District of New York "for participating in racketeering enterprise and conspiracy to violate federal narcotics laws." (Doc. No. 8-1 at 1, ¶ 3.) Petitioner entered BOP custody on February 22, 2018 (<u>id.</u> at 5), and his projected release date is March 20, 2027 (<u>id.</u> at 1, ¶ 3; <u>id.</u> at 5).[1]

---

[1] According to the BOP's Inmate Locator, however, Petitioner's current release date is March 20, 2026. The BOP's Inmate Locator is available at the following address:

The facts underlying the imposition of the disciplinary sanctions against Petitioner are as follows. On February 29, 2020, Petitioner was issued Incident Report Number 3372071 ("Incident Report"), charging him with a violation of Prohibited Act Code 108—Possession, Manufacture, or Introduction of Hazardous Tool. (Id. at 43.) The BOP's prohibited acts are set forth in 28 C.F.R. § 541.3, which, in turn, describes Code 108 as follows: "Possession, manufacture, introduction, or loss of a hazardous tool (tools most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety; e.g., hack-saw blade, body armor, maps, handmade rope, or other escape paraphernalia, <u>portable telephone</u>, pager, or other electronic device). See 28 C.F.R. § 541.3 (Table 1, 108) (emphasis added).

The Incident Report describes Petitioner's violation of Code 108 as follows:

> On 2/29/2020, I, Officer J. Johnson was posted as the East Compound OIC. While walking the 2nd floor of Unit 5751 between rooms 218 and 219, I instructed inmate Cannon, Bradford Registration Number 38036-054 to submit to a search[, and] he complied. While using the Garrett Pro-Pointer 2 metal detector serial number 56104403, as I scanned inmate Cannon's right pocket, the metal detector signaled for something metallic. I gave inmate Cannon a direct order to remove what was in his pocket[,] which is when he attempted to run from me but ran into an unidentified inmate and fell to the floor. Upon landing on the floor[,] inmate Cannon willingly submitted to hand restraints which were applied and a black

---

https://www.bop.gov/inmateloc/.

>in color Samsung smartphone was retrieved from his right pocket. It should be noted no force was used during this process.

(Doc. No. 8-1 at 43 (noting that staff became aware of this incident at 8:45 p.m.)) On that same date, at 9:30 p.m., Lieutenant W. Decker ("Decker") delivered a copy of the Incident Report to Petitioner. (Id.) The Incident Report was then referred to the Unit Disciplinary Committee ("UDC") for further disposition. (Id.)

Correctional Counselor J. Dixon ("Dixon") served as the UDC Chairman. (Id. at 43, 44.) Dixon advised Petitioner of his rights and acknowledged that he understood those rights. (Id. at 43, 45.) Petitioner declined to make a statement at that time. (Id.) Due to the "seriousness" of the Incident Report, Petitioner's "repetitive behavior[,]" and to allow for greater sanctions than what the UDC can impose, the UDC referred the Incident Report to the Disciplinary Hearing Officer ("DHO") for a hearing. (Id. at 43.)

On April 15, 2020, Petitioner appeared before L. Reynolds, the DHO. (Id. at 45.) The DHO reviewed Petitioner's rights with him, and Petitioner stated that he understood those rights. (Id. at 47.) Although Petitioner requested that two (2) witnesses provide testimony on his behalf, he waived his right to a staff representative,[2] and he did not present any written documentation as evidence or

---

[2] Although Petitioner initially requested a staff representative, the DHO's report reflects that Petitioner ultimately waived this right per his signature on the "BP A0294 form." (Doc. No. 8-1 at 45, 47.)

3

assert any procedural issues during the hearing. (Id. at 45, 47.) In addition, Petitioner elected not to make a statement during his hearing, but he denied the charged violation of Prohibited Act Code 108. (Id. at 45.) As for Petitioner's witnesses, Inmate Jimmie Young declined to testify, and Inmate Kevin Foye testified that he did not witness any occurrence on the second floor of Unit 5751 between Petitioner and "any officers on 2-29-2020 at 8:45 PM." (Id.)[3]

Based upon the greater weight of the evidence, the DHO ultimately found that Petitioner committed a violation of Prohibited Act Code 108. (Id.) The DHO based this finding on the reporting officer's written account of the underlying incident, the documentary evidence (i.e., the photograph depicting the black Samsung cell phone found in Petitioner's possession), the testimony from his witnesses (i.e., Foye and Young), and Petitioner's denial of the charged violation. (Id.) The DHO also based this finding on the fact that Petitioner was unable to provide the DHO with any evidence that would refute the charged violation or that would otherwise corroborate his denial thereof. (Id. at 48.)

As a result of these findings, the DHO sanctioned Petitioner with a disallowance of forty-one (41) days of good-conduct time, sixty (60) days

---

[3] There is no indication in the DHO's report that Inmate Kevin Foye was located at or near "rooms 218 and 219" at the time of Petitioner's infraction, and Petitioner does not appear to argue otherwise.

disciplinary segregation, and three-hundred and sixty (65) days loss of visiting privileges. (Id.) The DHO explained the reasoning for these sanctions as follows:

> The action/behavior on the part of [an inmate in] [p]ossessing a hazardous tool significantly threatens the health, safety, and welfare of not only himself, but of all persons, whether another inmate or any other person [is] involved in the act. This will not be tolerated. Past evidence has shown that disruptive conduct has led to serious damage to the institution, as well as serious injury to staff and inmates involved and not involved in the disruptive conduct. The sanctions imposed by the DHO were taken to inform the inmate that he will be held responsible for his actions/behaviors at all times.
>
> [In addition,] [t]he DHO considered your continued disruptive behavior, also your unwillingness NOT TO ACCEPT full responsibility for your actions, and the seriousness of this particular prohibited act infraction. The fact [that] there is a zero tolerance for inmates to possesses hazardous tools in a Correctional Setting, and the fact [that] this is your second Greatest Severity (100 level) incident report committed in the 24 month time period for REPEATED PROHIBITED ACTS WITHIN THE SAME SEVERITY LEVEL. Your last Greatest Severity incident report was committed on January 4, 2020[, which] was an unfavorable factor when determining your sanctions for this prohibited act. Clearly previous sanctions have not deterred you from engaging in this type of disruptive behavior[;] therefore[,] the DHO imposed slightly higher sanctions. You should be aware of the fact [that,] if this behavior continues[,] the DHO will consider significant progressive sanctions in accordance with P.S. 5270.09[.]

(Id.)

As noted in the DHO's report, Petitioner was advised of the DHO's findings, the specific evidence relied upon, the sanctions imposed, and the reasons for those sanctions. (Id.) Petitioner was also advised of his right to appeal the DHO's decision, and he was provided with a copy of the DHO's decision. (Id.) It appears

5

that, after receiving a copy of the DHO's decision, Petitioner began pursuing his administrative remedies. See, e.g., (id. at 49–57).

On July 5, 2022, while Petitioner was incarcerated at Federal Correctional Institution Allenwood ("FCI Allenwood") in White Deer, Pennsylvania, he commenced the above-captioned action by filing his Section 2241 petition (Doc. No. 1), along with various exhibits (Doc. No. 1-1). Petitioner asserts several grounds in his petition. He asserts due process violations in connection with his disciplinary proceedings for the Incident Report (Doc. No. 1 at 7–8), and he challenges the BOP's labeling of him as a "public safety factor[,]" which—in turn—prevents him from being sent to a "camp" (id. at 7). For relief, Petitioner requests that the Incident Report be expunged, his privileges be restored, and his security classification be dropped to "low" security. (Id. at 8.)

On September 13, 2022, after Petitioner paid the requisite filing fee (Doc. Nos. 2, 4), the Court deemed his Section 2241 petition filed, directed service of the petition on Respondent (i.e., the Warden at FCI Allenwood), and directed Respondent to respond to the allegations contained in the petition within twenty (20) days. (Doc. No. 6.) On October 3, 2022, Respondent filed a response. (Doc. No. 8.) As reflected by the Court's docket, Petitioner has not filed a reply, and the time period for doing so has long since expired. Thus, the instant Section 2241 petition is

ripe for the Court's resolution. For the reasons discussed below, the Court will deny the petition.

## II.   DISCUSSION

### A.   "Public Safety Factor" Claim

Generally speaking, Section 2241 confers federal jurisdiction over a habeas petition that has been filed by a federal inmate who challenges "not the validity but the execution of his sentence." See Cardona v. Bledsoe, 681 F.3d 533, 535 (3d Cir. 2012) (citations and footnote omitted); Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 241 (3d Cir. 2005) (stating that Section 2241 "allows a federal prisoner to challenge the 'execution' of his sentence in habeas"). While "the precise meaning of 'execution of the sentence' is hazy[,]" see id. at 242, the United States Court of Appeals for the Third Circuit ("Third Circuit") has defined this phrase to mean "put into effect" or "carry out." See id. at 243 (citation and internal quotation marks omitted).

As a result, a federal inmate may challenge conduct undertaken by the BOP that affects the duration of the inmate's custody. See, e.g., Barden v. Keohane, 921 F.2d 476, 478-79 (3d Cir. 1990) (finding that a federal inmate's petition is actionable under Section 2241, where the inmate attacks the term of his custody by challenging the manner in which the BOP is computing his federal sentence). A federal inmate may also challenge BOP conduct that "conflict[s] with express statements in the

applicable sentencing judgment." See, e.g., Cardona, 681 F.3d at 536–37 (providing that a federal inmate's petition is actionable under Section 2241, where the inmate attacks the execution of his sentence by showing that the BOP acted in a way that is "inconsistent with a command or recommendation in the [inmate's] sentencing judgment").

As discussed above, Petitioner claims that the BOP has labeled him as a "public safety factor" which, in turn, has prevented him from being sent to a "camp." (Doc. No. 1 at 7.) Petitioner further claims that, when he raised this issue with the BOP, he received a response stating, "you are doing time for your 1998 conviction which allows us to place a [p]ublic safety factor on you and it will not be removed." (Id.) Accordingly, Petitioner's Section 2241 petition appears to challenge the BOP's application of the public safety factor to him. See (id.).

A public safety factor "is relevant factual information regarding the inmate's current offense, sentence, criminal history, or institutional behavior that requires additional security measures to be employed to ensure the safety and protection of the public." See Merchenthaler v. United States, No. 19-cv-00471, 2020 WL 1244471, at *1 (M.D. Pa. Mar. 16, 2020). However, the Third Circuit has concluded—albeit in a non-precedential opinion—that "claims concerning the determination of [a petitioner's] custody level do not lie at the 'core of habeas' and, therefore, are not cognizable in a [Section] 2241 petition." See Levi v. Ebbert, 353

F. App'x 681, 682 (3d Cir. 2009) (unpublished) (quoting Leamer v. Fauver, 288 F.3d 532, 542–44 (3d Cir. 2002)).  This is because such claims do not concern "the fact or length of [a petitioner's] sentence or confinement."  See id. (citing Preiser v. Rodriguez, 411 U.S. 475, 500 (1973)).

Accordingly, the Court will dismiss Plaintiff's habeas claim concerning the BOP's application of the public safety factor.  See, e.g., id. at 681–82 (affirming district court's order denying petitioner's Section 2241 petition, which challenged his custody classification and requested that he be transferred to a prison camp or low-security prison, because such challenges are not cognizable in a Section 2241 petition); Briley v. Warden Fort Dix FCI, 703 F. App'x 69, 71 (3d Cir. 2017) (unpublished) (concluding that the Section 2241 petitioner's claim challenging the BOP's assignment of a public safety factor to his security classification was not cognizable under Section 2241 because his claim did not challenge the fact, duration, or execution of his sentence); Hribick v. Warden Fort Dix FCI, 695 F. App'x 25, 25–26  (3d Cir. 2017) (unpublished) (concluding the same).

### B.  Due Process Claims

In addition, Petitioner's Section 2241 petition asserts due process challenges under the Fifth Amendment to the United States Constitution based upon allegations concerning his disciplinary proceedings, which resulted in, inter alia, a loss of good conduct time.  (Doc. No. 1.)  At the outset, the Court notes that Petitioner's due

9

process challenges are properly brought pursuant to the provisions of Section 2241. See, e.g., Barden, 921 F.2d at 478–79 (finding that a federal inmate's petition is actionable under Section 2241, where the inmate attacks the term of his custody by challenging the manner in which the BOP is computing his federal sentence); Queen, 530 F.3d at 254 n.2 (noting that a challenge to a disciplinary action resulting in the loss of good-conduct time is properly brought pursuant to Section 2241, because "the action could affect the duration of the petitioner's sentence" (citations omitted)). That said, the Court turns to the governing legal standard.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law[.]" See U.S. Const. amend. V. Prisoners have a constitutionally protected liberty interest in good-conduct time. See Wolff v. McDonnell, 418 U.S. 539, 555-57 (1974). However, "while prisoners retain certain basic constitutional rights, including the protections of the [D]ue [P]rocess [C]lause, prison disciplinary hearings are not part of criminal prosecution, and inmates' rights at such hearings may be curtailed by the demands and realities of the prison environment." See Young v. Kann, 926 F.2d 1396, 1399 (3d Cir. 1991) (citing Wolff, 418 U.S. at 555-56.)

In Wolff, the United States Supreme Court set forth the due process protections that prisoners are entitled to "when prison officials seek to deprive them of good-time credits[.]" See Burns v. PA Dep't of Corr., 642 F.3d 163, 171-72 (3d

Cir. 2011). Those protections require: (1) an impartial decision-making body; (2) written notice of the charges, which must be given to the prisoner no less than twenty-four (24) hours before his appearance at the disciplinary hearing so that he can marshal the facts and prepare a defense; (3) the opportunity "to call witnesses and present documentary evidence in his defense when to do so will not be unduly hazardous to institutional safety or correctional goals;" and (4) a written statement by the fact finder as to the evidence relied upon and the reasons for the disciplinary action. See Wolff, 418 U.S. at 563–71. Additionally, the United States Supreme Court has explained that, where an illiterate prisoner is involved or where the complexity of the issue makes it unlikely that the prisoner will be able to collect and present the evidence that is necessary for an adequate command of the case, the prisoner "should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent [prisoner] designated by the staff." See id. at 570.

Where, as here, a prisoner challenges a disciplinary proceeding that deprived him of good-time credits, "the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke [such] credits." See Superintendent, Massachusetts Corr. Inst., Walpole v. Hill, 472 U.S. 445, 455 (1985). In other words, "[t]his standard is met if there was some evidence from which the conclusion of the [disciplinary board] could be deduced[.]" See id.

11

(citation and internal quotation marks omitted). Thus, determining "whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." See id. Rather, "the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." See id. at 455–56 (emphasis added) (citations omitted).

The United States Supreme Court has declined to embrace "a more stringent evidentiary standard as a constitutional requirement." See id. at 456. And, in declining to do so, the Supreme Court has explained as follows:

> Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. See Wolff, 418 U.S., at 562–563[.] The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact. Revocation of good time credits is not comparable to a criminal conviction, id. at 556[,] and neither the amount of evidence necessary to support such a conviction, see Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), nor any other standard greater than some evidence applies in this context.

See id.

Having set forth the governing legal standard, the Court turns to Petitioner's instant habeas claims.

12

1.      **The Incident Report and the UDC**

Petitioner asserts that there is a discrepancy between the first and second page of the Incident Report (i.e., Doc. No. 1-1 at 1, 2), concerning the exact time at which the UDC took action with respect to the charged violation. (Doc. No. 1 at 7 (arguing that the first page identifies the time as 7:30 a.m., and the second page identifies the time at 9:30 a.m.).) The Court, having reviewed Petitioner's claim, is unpersuaded as the Court sees no such discrepancy and, if anything, observes that the handwritten times on the first and second page of the Incident Report are, simply, difficult to read.

Even assuming arguendo, however, that there is such a discrepancy between the first and second page of the Incident Report, the Court fails to see the merit of this claim. For instance, Petitioner does not argue, and the evidence of record does not suggest, that he did not receive a decision from the UDC or that he suffered any prejudice concerning the exact time at which the UDC made its decision. See, e.g., Wilson v. Ashcroft, 350 F.3d 377, 380–81 (3d Cir. 2003) (holding, in the immigration context, that "there would be no due process violation in the absence of prejudice"); Gross v. Warden, USP Canaan, 720 F. App'x 94, 96 (3d Cir. 2017) (unpublished) (explaining, in the context of prison disciplinary proceedings that "due process is not violated absent a showing of prejudice" (citation omitted)). In addition, regardless of the exact time at which the UDC made its decision, the

evidence of record demonstrates that Petitioner received a decision from the UDC and that the UDC advised him of his rights concerning the charged violation. (Doc. No. 1-1 at 1, 2.) In addition, the evidence of record demonstrates that Petitioner did not appear before the DHO until April 15, 2020 and, thus, Petitioner had ample time following the UDC's decision to prepare for his hearing.

Accordingly, for all of these reasons, the Court concludes that Petitioner's claim that there is a discrepancy between the first and second page of the Incident Report, concerning the exact time at which the UDC took action with respect to Petitioner's charged violation, is without merit. As a result, this claim will be denied.[4]

2. **The DHO**

Next, Petitioner claims that the DHO's findings are inconsistent with the contents of the Incident Report. (Doc. No. 1 at 7.) More specifically, Petitioner claims that the Incident Report states that the hazardous tool (i.e., the cell phone) was found "between rooms 218 and 219" and retrieved from his "right pocket,"

---

[4] The Court briefly notes that the second page of the Incident Report identifies Petitioner as "Cannon, Andrew" as opposed to "Cannon, Bradford." (Doc. No. 1-1 at 2.) Although the second page of the Incident Report does not contain Petitioner's correct first name, it contains Petitioner's correct last name, as well as his correct BOP registration number (i.e., 38036-054). In addition, the first page of the Incident Report, which is the main page of document, correctly identifies Petitioner as "Cannon, Bradford[,]" and includes his correct BOP registration number. (Id. at 1.)

14

whereas, the DHO's report states that the phone was found in his "hand in [his] assigned room/cell[.]" (Id.); see also (Doc. No. 1-1 at 5).

The Court, having reviewed Petitioner's claim, acknowledges that, in this particular section of the DHO's report, the DHO could have been more careful in his/her use of the word "hand" as opposed to "pocket" and in his/her use of the word "assigned room/cell" as opposed to in "between rooms 218 and 219[.]" See (id.). However, the Court also observes that the DHO's report expressly acknowledges, and explicitly incorporates into his/her report, the reporting officer's written account of the charged violation, which establishes that the cell phone was found in Petitioner's "right pocket" on the "2nd floor of Unit 5751 between rooms 218 and 219" (id. at 5). In addition to making this observation, the Court finds that, when the DHO's report is read as a whole, it is indeed consistent with the reporting officer's written account and investigation, the documentary evidence submitted to the DHO during the hearing, and the witnesses' testimony. (Id. at 5–6.)

Accordingly, for all of these reasons, the Court concludes that Petitioner's claim that the DHO's findings are inconsistent with the contents of the Incident Report is without merit. The Court will, therefore, deny this claim.

15

### 3. Administrative Appeals Process

Finally, Petitioner claims that the Incident Report and "the process in which it has been handled should be very questionable." (Id. at 8.) In support, Petitioner seems to suggest that, during his administrative appeals process, he received a response indicating that his appeal from the DHO's decision had been partially granted. (Id.) Petitioner has submitted that response into the record. (Doc. No. 1-1 at 9.) That response is dated January 19, 2021, and it provides, in pertinent part, as follows:

> A review of your appeal reveals questions concerning the disciplinary process. Accordingly, this disciplinary action is being remanded for further review and rehearing, if necessary. You will be notified of the date and time of any further proceedings. After further proceedings, you may appeal again to this office, if you desire. To the extent above, your appeal is partially granted.

(Id.) In connection with this response, Petitioner argues that when (5) months went by without receiving any notice that his "rights and privileges" had been restored, he started "inquireing [sic] to the administration[,]" and he received a memorandum instructing him to file a new administrative remedy appeal. (Id. at 8.) Petitioner has also submitted that memorandum into the record. (Doc. No. 1-1 at 10.) It is dated July 13, 2021, and it states, in pertinent part, as follows:

> I am requesting that you accept this filing for inmate Cannon Bradford, Reg. No. 38036-054, for Administrative Remedy id number 1035909-R2. Inmate Cannon was not notified that he was required to submit a new Administrative Remedy appeal until today July 13, 2021.

16

(Id. at 10.) Petitioner argues that he did not receive this memorandum until after he had already filed his first appeal. (Doc. No. 1 at 8.)

At the outset, the Court notes that it is unclear what happened after Petitioner's appeal was partially granted. The Court also notes, however, that the appeal response did not require a new hearing or restoration of Petitioner's privileges. Rather, it simply explained that the "disciplinary action [was] remanded for further review and rehearing, if necessary." (Doc. No. 1-1 at 9 (emphasis added).) The Court finds that such an appeal response, in itself, does not give rise to due process violation. In addition, the Court has conducted an independent and thorough review of the record in this matter and finds that the requirements of due process were satisfied here.

More specifically, the evidence of record establishes that Petitioner received advance notice of the charged violation against him when Decker delivered a copy of the Incident Report to Petitioner on February 29, 2020, at 9:30 p.m. (Doc. No. 1-1 at 1, 3.) In addition, during the subsequent UDC proceedings, Petitioner was advised of his rights and acknowledged that he understood those rights. (Id. at 1.) Petitioner then appeared for his DHO hearing on April 15, 2020, and thus had about forty-five (45) days to marshal the facts and prepare a defense for his hearing. (Id. at 3.) At the hearing, Petitioner was advised of his rights, and he was given the opportunity to make a statement and to present witnesses and documentary evidence in his defense. (Id. at 3.) Petitioner was also provided a copy of the DHO's written

report, which sets forth the evidence relied upon, the sanctions imposed, and the reasons for those sanctions. (Id. at 5.) Petitioner makes no argument, and the record does not suggest, that the DHO was personally or affirmatively involved in the underlying incident (i.e., the search and confiscation of the hazardous tool) or any other part of the initial disciplinary process. And, finally, the Court notes that the DHO's decision was supported by "some evidence" of Petitioner possessing the cell phone, which, in turn, is sufficient to uphold Petitioner's disallowance of good-conduct time. Specifically, the DHO relied upon the written account of the reporting officer, the documentary evidence, the witnesses' statements, and Petitioner's denial of the charge. Thus, the requirements of due process have been satisfied here. See Hill, 472 U.S. at 455 (explaining that "the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits").

### III. CONCLUSION

Accordingly, for all of the foregoing reasons, the Court will deny the instant Section 2241 petition. (Doc. No. 1.) An appropriate Order follows.

Dated: January 2, 2024

s/ Sylvia H. Rambo  
SYLVIA H. RAMBO  
United States District Judge